Douglas R. Ricks, OSB No. 044026
Joshua G. Flood, OSB No.
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
E-Mail: dricks@sussmanshank.com
        jflood@sussmanshank.com

Proposed Attorneys for Debtors-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 26-32378-thp11 (Joint Administration Pending) |
| Fairway America, LLC, | |
| Debtor-in-Possession. | |
| In re | Case No. 26-32379-thp11 (Joint Administration Pending) |
| Fairway America Management Group II LLC, | |
| Debtor-in-Possession. | DECLARATION OF MATTHEW W. BURK IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS AND APPLICATIONS |

I, Matthew W. Burk, hereby declare:

1.      I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors.[1] I am the president of Skylands Investment Corporation, which is the manager of Fairway America, LLC ("**Fairway America**"). I am the manager of Fairway America Management Group II LLC ("**FAMG II**"). I make this declaration based on my own personal

[1] "**Debtors**" means collectively the two entities designated as a debtor in the above-captioned cases (each a "**Debtor**") that filed voluntary petitions for relief on July 8, 2026 in the United States Bankruptcy Court for the District of Oregon. The Debtors will file a motion to have their cases jointly administered with the Fairway America, LLC case being designated as the lead case.

**Page 1 of 14** - DECLARATION OF MATTHEW W. BURK

knowledge, except as otherwise stated. If called upon, I would testify competently to the facts set forth herein.

2.      I submit this declaration in support of the voluntary petitions under chapter 11 filed by each of the Debtors and in support of the (a) Debtors' Motion for Joint Administration (the "**Administration Motion**"), (b) Debtors' Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral (the "**Cash Collateral Motion**"), (c) Debtors' Motion for Entry of Order to Pay Certain Payroll Related Expenses (the "**Payroll Motion**"), and (d) Debtors' Motion for Order Authorizing Continued Use and Maintenance of Existing Bank Accounts and Business Forms (the "**Banking Motion**") (collectively, the "**First Day Motions**")[2].

3.      I also submit this declaration in support of the (a) Application to Employ Counsel for Debtors (Sussman Shank LLP) (the "**SSLLP Application**") and (b) Application to Employ Professional (Eric Camm) (the "**Camm Application**") (collectively, the "**Applications**").

4.      I am familiar with the First Day Motions and believe that the relief requested is necessary to enable the Debtors to operate with minimal disruption and is critical to enable the Debtors to continue to operate in the ordinary course of business. The relief requested in the First Day Motions is in the best interest of the Debtors' estates and their creditors.

### DEBTORS' ORGANIZATION AND AFFILIATES

5.      The Debtors are affiliated entities in a broader organization engaged in managing pooled private investment capital and sponsored syndications. The investments and syndications are real estate focused but cover a broad swath of real estate types, including multifamily, office, retail, industrial, self-storage, and more.

6.      Currently, the Debtors' list of affiliates includes the following:

   a. Fairway America – Oregon limited liability company with majority membership held by Eastridge Investment Group, LLC;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions.

**Page 2 of 14** - DECLARATION OF MATTHEW W. BURK

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

b.  FAMG II – Delaware limited liability company with majority membership held by Fairway America;

c.  Fairway America Management Group III LLC ("**FAMG III**") – Delaware limited liability company with majority membership held by Fairway America;

d.  Fairway America Management Group IV LLC ("**FAMG IV**")– Delaware limited liability company with sole membership held by Fairway America;

e.  Fairway America Capital Markets Group LLC (not operating) – Delaware limited liability company with sole membership held by Fairway America;

f.  Fairway America Investment Advisors, LLC – Delaware limited liability company with sole membership held by Fairway America; and

g.  Verivest LLC – Delaware limited liability company with majority membership held by Fairway America.

7.    In addition, Fairway America and its affiliates provide management and investment services to the following entities:

a.  Fairway America Fund VII LP ("**Fund 7**") – Delaware limited partnership, FAMG II is the general partner;

b.  Fairway America Fund VIIQP, LP ("**Fund 7 QP**") – Delaware limited partnership, FAMG II is the general partner;

c.  Fairway America Value-Add Self-Storage Fund LLC ("**FAVS**") – Delaware limited liability company with FAMG III as its manager;

d.  Fairway Bamboo GP Fund LLC – Delaware limited liability company with FAMG IV as its manager; and

e.  Fairway Vivo GP Fund LLC – Delaware limited liability company with FAMG IV as its manager.

8.    The entities referenced in paragraphs 6 and 7, above, other than Verivest LLC, comprise the "**Fairway Companies**" and are referred to as such in this Declaration.

**Page 3 of 14** - DECLARATION OF MATTHEW W. BURK

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

9. Finally, Fairway America provides management services to a number of special purpose entities that have independent ownership and maintain separate financials from Fairway America. Those entities along with Fairway America's role are set forth on **Exhibit 1** attached hereto and referred to as the "**Fairway Syndications**" in this Declaration.

**DEBTORS' BACKGROUND**

10. I founded Fairway Financial Services, Inc. in September 1992. The business initially operated as a mortgage brokerage, arranging residential and commercial real estate loans and placing those loans with third-party lenders and investors. After several years in that business, I decided to move from brokering individual loans to managing pooled private investment capital. Around 1999 or 2000, I launched the first of what proved over many years to eventually be a series of Regulation D pooled investment funds. Over the following years, that business operated several commercial real estate lending funds, generally referred to as Funds 1 through 4. The business focused principally on originating and managing commercial real estate loans.

11. In January 2008, I brought in a business partner and we formed Fairway America. Unfortunately, shortly after the partnership was formed, my partner was diagnosed with cancer and passed away just under two years later. I resumed sole control of Fairway America during this time frame which is now often referred to as the "Great Recession". That period was difficult for the business. Fairway America was required to wind down the company's primary operating fund during a distressed real estate and capital market, which meant resolving and selling assets at a time when liquidity and asset values were severely impaired.

12. While Fairway America was winding down that primary fund and evaluating the next direction for the business, several other real estate and asset-based investment managers began approaching us for help creating and administering their own pooled investment funds. Fairway America and Verivest began providing business advisory and support services to managers around the country. This included advice around fund structure, operational models,

**Page 4 of 14** - DECLARATION OF MATTHEW W. BURK

investor reporting, investment processes, and the practical realities of building a private fund investment-management business.

13.    The original strategy was straightforward. Fairway America believed it could build relationships with capable managers by first helping them through advisory work, then supporting their growing businesses through fund administration, and ultimately partnering with or investing alongside, in its view, the best of those managers through Fairway America's own investment vehicles. For that purpose, Fairway America formed Fund 6, later Fund 7 and Fund 7 QP, FAVS, and eventually many individual syndications. Fund 7 and Fund 7 QP became the most significant of our pooled investment vehicles and remain in existence today. They were structured as open-ended funds and invested in a broad range of real estate and real estate asset-based opportunities, including funds, syndications, real estate secured loans, LP and GP positions, and frequently alongside operating partners and managers in different markets.

14.    As the advisory clients launched and grew their own funds, many discovered they needed help with the back-office work required to manage those funds and they came to us. They needed support tracking investor capital accounts, calculating allocations and distributions, maintaining records, preparing reports, coordinating tax reporting, and handling the operational work involved in managing private investment vehicles. The follow-on demand for these services from the advisory work was significant and Fairway America believed it was both synergistic with our advisory business and a source of organic origination for (and ability to underwrite and monitor) qualified investment opportunities. Fairway America initially provided this work directly. Over time, the advisory and administration businesses became significant enough that there was confusion in the market about whether Fairway America was principally an investment manager or a service provider to other investment managers. In 2017, Fairway America separated the administration business into a separate company, initially called Redwood Real Estate Administration and later in 2020 rebranded as Verivest.

**Page 5 of 14** - DECLARATION OF MATTHEW W. BURK

15.    Fairway America and Verivest continued to have an important commercial relationship. Fairway America generated business for the administration company, and the administration company served a number of the Fairway Companies' funds, syndications, and advisory clients. For a period of time, the businesses also shared certain resources and personnel, with costs allocated between them. Over time, however, Verivest developed into a separate operating company with its own employees, management, investors, creditors, customers, and business strategy.

16.    Throughout the mid- and late-2010s, the Fairway Companies continued to expand. They operated pooled investment funds, sponsored and managed individual syndicated special-purpose entities with sponsor partners they had come to know through business development efforts, continued to provide advisory work to many managers, built fund-administration capabilities, developed supporting technology, and held live educational and networking events for managers and investors. In short, the Fairway Companies developed extensive capabilities intended to support the same ecosystem of private real estate and asset-based investment managers.

17.    The strategy was to create a broader platform that could help managers raise and manage capital, operate their businesses, and execute investments. In turn, those relationships gave the Fairway Companies access to a broader range of investment opportunities. In hindsight, although the businesses served related clients and stakeholders, the breadth of the functions and services the Fairway Companies were providing required different capabilities, systems, people, and management attention. That complexity became a meaningful challenge as the organization grew.

18.    By 2020 through 2022, the Fairway Companies had grown substantially. At its peak, the Fairway Companies were involved in dozens of syndications and was managing four pooled investment funds. Across the various funds and syndications, the Fairway Companies were responsible for several hundred million dollars of investor equity and, including asset-level debt, approximately $1 billion of total assets. The companies had approximately as many as 30 people

**Page 6 of 14** - DECLARATION OF MATTHEW W. BURK

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

across the organization to perform all of the complex functions of such a business, including origination/acquisitions, investment analysis and underwriting, asset management, corporate and entity level finance and accounting, capital raising, investor relations, legal, compliance, reporting, tax and audit coordination, insurance, technology, and other operational functions.

19.    Fairway America developed and deployed significant formal operating and compliance processes. Fairway America had an investment committee, a chief compliance officer, general counsel, a company president, CFO, outside legal counsel, private placement memoranda and offering documents, documented underwriting and investment-review processes, and more. It had become a sizable private investment-management platform with substantial administrative and fiduciary responsibilities that it took very seriously and had qualified personnel in place to oversee.

20.    The rapid increase in interest rates beginning in the second half of 2022 was the principal catalyst for the deterioration that has followed. As capital markets tightened dramatically, debt became materially more expensive and substantially less available. Refinance or sale transactions that had been targeted to occur did not occur on the anticipated terms or schedules or in many cases at all. Buyers became less active, transaction volume declined precipitously, valuations fell, construction and operating costs increased, rents flattened (or fell) in many asset types and markets, and many assets took longer to stabilize, sell, or refinance, or never were able to achieve those outcomes. In general, commercial real estate suffered a severe contraction and devaluation beginning in late 2022 and continuing to the present day.

21.    Many of the Fairway Companies' investments had been acquired relatively recently when those market conditions changed. During 2023 and 2024, Fairway America and its operating partners worked to stabilize assets, preserve value, manage lender relationships, seek additional capital where appropriate, and attempted to avoid sales under distressed conditions. In some situations where it appeared advisable, additional capital was raised to support assets and extend the time available to pursue a better outcome. Other times it was either not obviously advisable or even if it appeared to be, the capital was not available. In many cases, these efforts were ultimately

**Page 7 of 14** - DECLARATION OF MATTHEW W. BURK

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

insufficient because the market downturn lasted longer and proved more severe than anticipated. The syndicated nature of many of the investments and the widespread difficulties happening across many sponsors and investors made attracting add-on or new capital extremely challenging and in many cases impossible, which continues to this day.

22.    Fairway America often invested as a limited partner or co-general partner alongside local or specialized operating partners. As a result, Fairway America did not and does not have unilateral authority to take over an asset or dictate its complete course of action. The degree of control varied and does vary from investment to investment based on individual operating agreements. Fairway America's ability to protect value often depended on working with operating sponsor partners, lenders, investors, and other stakeholders which also vary from investment to investment. As market conditions have worsened and increasingly levels of distress have impacted these partners, their own specific situations and pressures significantly influenced (and does to this day) their willingness and ability to execute.

23.    As market conditions continued to deteriorate, Fairway America and FAMG II determined that it was no longer practical to operate Fund 7 and Fund 7 QP as open-ended investment vehicles. Uncertainty regarding asset values, the increasing need for additional capital in certain investments, and the resulting difficulty of establishing reliable net asset values made continued fundraising and regular NAV-based operations impracticable. The funds were therefore placed into wind-down and ceased considering ongoing new investment activity.

24.    The deepening and prolonged weakness in the market had a direct effect on FA's corporate income. FA historically generated revenue from three principal sources: (a) Acquisition, origination, or transaction fees paid when a new investment initially closed; (b) Ongoing asset-management and other recurring fees paid by funds or individual investment entities; and (c) Carried interests or profit participations expected to be realized when investments were successfully sold or otherwise liquidated.

**Page 8 of 14** - DECLARATION OF MATTHEW W. BURK

25.    Since 2023, the Fairway Companies have completed very few new transactions. Acquisition and origination income has declined from a meaningful source of revenue to very little or none. Asset-management fees have also declined because many underlying investments lack sufficient cash flow to pay fees that may otherwise be contractually due. In many cases, fees have been deferred or not recognized. The value of Fairway America's anticipated carried interests has also declined substantially as underlying asset values and projected profits have fallen or completely evaporated.

**EVENTS LEADING TO BANKRUPTCY**

26.    The duration and severity of the downturn that began in 2023 proved substantially greater than anticipated. By early 2025, Fairway America's declining transaction income, reduced or deferred management fees, diminished carried-interest expectations, inability to replace eroded revenue sources, and lack of liquidity made continued debt service unsustainable.

27.    Fairway America has reduced its staff significantly and repeatedly as corporate income and the portfolio have declined and the downturn has deepened and lingered. The remaining team is small but is appropriately sized and absolutely necessary to preserve and realize value from the legacy portfolio and the company's remaining rights.

a.    Jay Zollinger is a Fairway principal and General Counsel. He is responsible for legal matters, negotiations, claims, entity governance, and ongoing work with outside counsel, counterparties, lenders, and other stakeholders.

b.    Angie Henderson is Fairway America's senior underwriter and has worked with me for approximately 30 years. She has deep institutional knowledge of the company's historical investments and remains deeply involved in monitoring assets, reviewing financial information, and evaluating the status of the portfolio.

c.    Maryna Kovalyshyna is responsible for investor relations, communications, and administrative support. The Fairway Companies still have hundreds of investors

**Page 9 of 14** - DECLARATION OF MATTHEW W. BURK

across its funds and syndications, and ongoing communication, reporting, and administrative coordination remain necessary.

d. Manpreet Bains is responsible for important financial and administrative work, including financial reporting, accounting coordination, and work necessary to support tax returns and financial information for approximately 50 entities.

e. Matt Coleman served as Fairway America's lead asset manager for several years, including throughout the wind-down process. Although Mr. Coleman recently transitioned from full-time employment to other employment, Fairway America retains access to his institutional knowledge and asset-level expertise on an as-needed contract basis. Mr. Coleman can assist with underwriting, financial analysis, refinancing and sale evaluations, and other asset-specific matters where his familiarity with the portfolio is particularly valuable. This arrangement allows Fairway America to retain specialized support as needed while keeping the cost variable and aligned with the needs of the wind-down.

f. I remain Fairway America's Chief Executive Officer and continue to be involved in its major strategic, capitalization, creditor, and asset-related decisions. In recent years, I have devoted increased direct attention to Verivest because Fairway America's ownership and receivables interest in Verivest are significant remaining assets and because stabilizing and growing Verivest is, in my judgment, important to preserving and potentially increasing the value of that interest.

28.    That work has not displaced Fairway America's management of its legacy portfolio. Fairway America's historical and remaining team have divided responsibilities based on experience and function.

29.    Fairway America continues to hold a majority ownership interest in Verivest. Verivest is a separately operated fund-administration and advisory business with its own

**Page 10 of 14** - DECLARATION OF MATTHEW W. BURK

management, employees, shareholders, creditors, ownership interests, and operating business. Fairway America's ownership interest in Verivest is important, but it is not a source of immediate liquidity.  Fairway has also lent money to Verivest to help fund its operations and support the value of its subsidiary—one of its largest assets.  As of the date of this filing, Verivest owes Fairway large intercompany receivable, which Verivest cannot currently repay, but with may be an important source of capital for the repayment of Fairway's debts if Verivest can in the future repay this debt.

30.     During the first half of 2026, I formally explored a sale of Verivest. Verivest retained an investment banker, completed a quality-of-earnings process, prepared diligence materials, entered into numerous nondisclosure agreements, and held multiple management meetings with potential buyers. That process did not produce a transaction at a value that would provide a meaningful recovery to Fairway America. In my judgment, a sale of Verivest now would be a distressed transaction at a point when its value is depressed. Fairway America believes its ownership interest is more likely to produce value through Verivest's continued operation and growth than through a distressed sale.

31.     The individual funds, syndications, and asset-level special-purpose entities are separate legal entities. Fairway America's interests generally consist of management rights, general partner or co-general partner rights, contractual rights to fees or carried interests, equity interests, and other economic rights associated with those entities and investments.

32.     Fairway America does not own underlying assets outright and, depending on the governing documents for each entity, does not have unilateral authority to cause a sale, refinancing, recapitalization, or other disposition of every investment. Fairway America's ability to create value depends on continuing to work with its operating or joint venture partners, lenders, investors, and other stakeholders to obtain the best reasonably available outcome for each asset.

33.     At the same time, Fairway America's continued role in managing or co-managing the remaining investments is important both to the investors in those investments and to Fairway

**Page 11 of 14** - DECLARATION OF MATTHEW W. BURK

SUSSMAN SHANK LLP, ATTORNEYS AT LAW
1000 SW BROADWAY, SUITE 1400, PORTLAND, OREGON 97205-3089
TELEPHONE (503) 227-1111 | FACSIMILE (503) 248-0130

America's creditors. Fairway America's potential recovery from deferred fees, carried interests, and other economic rights depends on producing the best reasonably available outcome for the underlying investments. Those interests overlap: preserving value in the underlying assets may benefit their direct investors while also preserving potential value for the Debtors' estates.

34. The existing Fairway America team has deep and long-standing knowledge of the assets, the operating partners, the governing documents, the lender relationships, and the historical context of the portfolio. Replacing that team with a third party would require the new party to develop those relationships and knowledge while operating under the same contractual limitations and market conditions. Fairway America believes that retaining its current team is the most efficient and cost-effective way to continue the work necessary to protect and realize value.

35. Fairway America has attempted to remain outside of bankruptcy by proactively communicating with creditors, negotiating extensions and accommodations, reducing expenses, and continuing to work the underlying assets. Many parties have been constructive and have recognized the difficult market environment and circumstances. However, Fairway America now faces a combination of overdue or maturing obligations, creditor pressure, litigation, and insufficient liquidity. The Debtors can no longer realistically remain outside a formal restructuring or liquidation process.

**BANKRUPTCY GOALS AND PROFESSIONALS**

36. Fairway America is not seeking to resume its former growth strategy, raise new capital for new Fairway-sponsored or managed real estate investments, or restart its historical operating model. The purpose of a bankruptcy case is to preserve and maximize the value of the Debtors' remaining assets and rights in an orderly way.

37. To aid in its reorganization effort, the Debtors have engaged the following professionals: Sussman Shank LLP ("**Sussman Shank**") (as its attorneys) and TurningPointe, LLC ("**TPSA**") (as its Chief Restructuring Officer).

**Page 12 of 14** - DECLARATION OF MATTHEW W. BURK

38.    In my capacity as president of Skylands Investment Corporation, which is the manager of Fairway America and as manager of FAMG II, I authorized the filing of the Debtors' voluntary petitions and the employment of these professionals, consistent with the authority provided to the Debtors under their respective operating agreements.

39.    Fairway America initially engaged Sussman Shank in August of 2024 to provide advice concerning restructuring options and bankruptcy alternatives. As I have outlined in this Declaration, when it became clear that the Debtors could not carry on their affairs outside of a formal legal process, the Debtors worked with Sussman Shank to prepare and file these chapter 11 cases.

40.    The Debtors selected Sussman Shank as counsel because of Sussman Shank's extensive experience in representing Chapter 11 debtors.  The Debtors believe Sussman Shank to be well-qualified to represent them and provided informed consent to Sussman Shank to represent them.

41.    Prior to the Petition Date, Debtors paid Sussman Shank a total of $69,237.37 of which $10,000.00 is held as a retainer. This retainer will be applied to post-petition fees and expenses subject to application and approval of the Court. Sussman Shank may have its retainer refreshed in full upon exhaustion of the funds so held as part of its application and approval of its fees and expenses.

42.    TPSA was more recently engaged (May 2026) to provide additional advice, support, and leadership during the chapter 11 process. As I and Fairway's General Counsel are also creditors, we recognized the need to employ an outside professional to ensure that the Debtors are able to operate, perform their fiduciary duties, and provide the transparency required of a debtor-in-possession under chapter 11 reorganization.

43.    Debtors selected TPSA for the reason that TPSA is competent and experienced in the field of business and turnaround consulting.

**Page 13 of 14** - DECLARATION OF MATTHEW W. BURK

44.     Prior to the Petition Date, Debtors paid TPSA a total of $10,000.00 of which $7,725.00 is held as a retainer. This retainer will be applied to post-petition fees and expenses subject to application and approval of the Court. TPSA may have its retainer refreshed in full upon exhaustion of the funds so held as part of its application and approval of its fees and expenses.

45.     Debtors request that TPSA be authorized to represent the Debtors in the capacity of CRO for the duration of the Debtors' bankruptcy cases and removable only by order of the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 9th day of July, 2026.

By /s/ Matthew W. Burk
Matthew W. Burk

**Page 14 of 14** - DECLARATION OF MATTHEW W. BURK

| **Legal Name of Entity** | **FA Manager or Co-Manager** |
|---|---|
| Northshore SPE Manager LLC | Co-Manager |
| Bamboo Broadway Manager LLC | Co-Manager |
| SBRE VIII LLC (Lorain) | Manager |
| SBRE XIII LLC (Sacramento) | Manager |
| SBRE XIV LLC (Southgate) | Manager |
| Cor3(Salt Creek)Ventures Manager LLC | Manager |
| Cor3(Sydney Park)Ventures Manager LLC | Manager |
| Butler Drive SPE Manager LLC | Co-Manager |
| Crossways SPE Manager LLC | Co-Manager |
| Riverchase SPE Manager LLC | Co-Manager |
| SBRE II LLC (Colony) | Manager |
| 9 on Canal Promote LLC | Co-Manager |
| 9 on Canal Member LLC | Manager |
| 350 Canal Land JV LLC | Co-Manager |
| A62 Apts Promote LLC | Co-Manager |
| A62 Apts Member LLC | Manager |
| Forestview Promote LLC | Co-Manager |
| Forestview Fairway GP LLC | Manager |
| Fountain Parc Member LLC | Manager |
| Fountain Parc Promote LLC | Co-Manager |
| Maplebrook Member LLC | Manager |
| Maplebrook Promote LLC | Co-Manager |
| Riverview Crossings Fairway GP | Manager |
| Riverview Promote Apts LLC | Co-Manager |
| Troy Place Fairway GP LLC | Manager |
| Troy Place Promote LLC | Co-Manager |

Exhibit 1 - Page 1 of 1